UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                           :
EILEEN MASTRIO, ADMINISTRATOR              :        3:08 CV 1148 (JBA)
FOR EILEEN PRENDERGAST, DECEASED           :
                                           :
V.                                         :
                                           :
KATHLEEN SEBELIUS, SECRETARY OF            :
HEALTH AND HUMAN SERVICES                  :        DATE: OCTOBER 26, 2011
                                           :
-------------------------------------------------------x
```

RULING ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEES

On July 31, 2008, Eileen Prendergast commenced this action against defendant Health and Human Services, seeking a Temporary Restraining Order ["TRO"] enjoining defendant from continuing to deny coverage of home health services through Medicare Part C to plaintiff Prendergast. (Dkts. ##1, 4). The next day, then Senior United States District Judge Alan H. Nevas granted plaintiff's Motion for a TRO, effective from August 1, 2008 to August 18, 2008. (Dkt. #5; see Dkt. #6).

On August 22, 2008, plaintiff filed a Motion for Preliminary Injunction, followed by a Motion for Extension of Temporary Restraining Order filed five days later. (Dkts. ##7-9, 11, 12). On September 2, 2008, defendant filed a Motion to Dismiss for Lack of Jurisdiction and for Failure to Join a Required Party, along with a brief in opposition to plaintiff's Motion for Preliminary Injunction. (Dkts. ##12-15). On September 9, 2008, plaintiff filed her reply to defendant's opposition to her Motion for Preliminary Injunction, followed by several affidavits in support. (Dkts. ##16-18, 21). On September 19, 2008, plaintiff filed her brief in opposition to defendant's Motion to Dismiss. (Dkt. #22). Status conferences were held before Judge Nevas on November 6, 2008 and January 13, 2009, at the latter of which counsel agreed that the Court would postpone ruling on the pending motions and would

await a status report in April 2009.  (Dkts. ##25-27, 29-30).

On February 24, 2009, upon the retirement of Judge Nevas, the case was transferred to United States District Judge Janet Bond Arterton and three days later, Judge Arterton issued an Order withdrawing plaintiff's Motion for Preliminary Injunction and Motion for TRO, "without prejudice to renew at any time." (Dkts. ##31, 34).  An Order of Dismissal entered that same day, in which Judge Arterton noted that the case was "administratively closed by agreement of the parties with either party having the right to restore it to the active docket by motion." (Dkt. #35).  Although not reflected on the electronic docket, the parties are in accord that defendant also agreed to withdraw her motion as well, without prejudice to renewal at a later time.  (Dkt. #52, at 9; Dkt. #55, at 4-5).[1]

Thereafter, on June 9, 2011, more than two years later, plaintiff filed a Motion to Reopen the Case and Restore to Active Docket, in which it was noted that Mrs. Prendergast died on December 14, 2010; plaintiff sought to restore the case to the Court's active docket to file a Statement Noting Death and a Motion to Substitute Plaintiff, as well as a Motion for Attorneys' Fees and Costs.  (Dkt. #38, at 2-3; see Dkt. #37).  Defendant opposed plaintiff's Motion to Reopen fifteen days later, in which opposition defendant contended that "[t]here is no point restoring the case to the active docket for the sole purpose of a filing a motion for attorney's fees since the pre-requisites to an award have not and cannot be met." (Dkt. #39, at 3).  Plaintiff filed her reply brief five days later, on June 29, 2011 (Dkt. #40), and the next day, Judge Arterton granted plaintiff's Motion to Reopen.  (Dkt. #41).  Plaintiff filed her Suggestion of Death and Motion to Substitute Party on July 5 and 6, respectively, and

---

[1]When this action was filed in late July 2008, Michael L. Leavitt was Secretary of Health and Human Services.  He was replaced in 2009 by Kathleen Sebelius.  Therefore, Sebelius is now referred to as the defendant, even for events that transpired in 2008.

on July 11, 2011, Judge Arterton granted the Motion to Substitute Party, replacing plaintiff Prendergast with Eileen Mastrio, the administrator of Prendergast's estate.[2]  (Dkts. ##42-44).

On July 18, 2011, plaintiff filed an Amended Complaint seeking declaratory, injunctive and mandamus relief (Dkt. #47), and four days later, on July 22, 2011, Judge Arterton held a telephone status conference with counsel.  (Dkts. ##51, 59).  Three days later, on July 25, 2011, Judge Arterton filed a Scheduling Order.  (Dkt. #48).  In accordance with this Scheduling Order, that same day, July 25, 2011, plaintiff filed her Consent Motion to Dismiss the Action, which was granted by Judge Arterton three days later.  (Dkts. ##49-50).  Also in accordance with this Scheduling Order, plaintiff filed the pending Motion For Attorneys' Fees, Expenses, and Costs, with briefs and affidavits in support, on August 19, 2011 (Dkt. #52),[3] which motion was referred to this Magistrate Judge three days later.  (Dkt. #53).  On September 9, 2011, defendant filed her brief in opposition (Dkt. #55),[4] and thirteen days

---

[2]The Court's reference to "plaintiff" encompasses plaintiff Prendergast and her administrator, as appropriate.

[3]Attached to plaintiff's motion and brief are the following exhibits: affidavit of Gill Deford, sworn to August 16, 2011, with time sheets attached (Exh. 2.A); Travel Expense Reimbursement Forms, dated August 12, September 15, November 10, 2008, and January 27, 2009 from Margaret M. Murphy (Exhs. 2.B-2.C, 2.E-2.F); Travel Expense Reimbursement Form, dated September 12, 2008, for Gill Deford (Exh. 2.D); Receipt of Filing Fee, dated July 30, 2008 (Exh. 2.G); affidavit of Nancy V. Gifford, sworn to August 16, 2011,with time sheets attached (Exh. 3); affidavit of Margaret M. Murphy, sworn to August 17, 2011, with time sheets attached (Exh. 4); affidavit of Abigail C. Sheehan, also sworn to August 17, 2011, with time sheets attached (Exh. 5); and affidavit of Judith A. Stein, sworn to August 15, 2011, with time sheets attached (Exh. 6).

[4]The following three exhibits are attached to defendant's brief: copy of e-mail between counsel, dated October 17, 2008 (Exh. A); copy of "Second Declaration of Abigail Sheehan," sworn to August 22, 2008, with copies of records from VNA, plaintiff's doctor, and Aetna attached (Exh. B); and another copy of Aetna's letter, dated August 12, 2008 (Exh. C).

later, plaintiff filed a reply brief.  (Dkt. #58).[5]

For the reasons stated below, plaintiff's Motion for an Award of Attorneys' Fees, Expenses and Costs (Dkt. #52) is **granted in part, in the amount of  $32,717.04 for attorney's fees and $835.50 in costs, for a total of $33,552.54**.

## I. FACTUAL BACKGROUND

At the commencement of this case, plaintiff was suffering from Amyotrophic Lateral Sclerosis ["ALS"], diabetes mellitus type 2, and other ailments that rendered her unable to walk, homebound in a motorized wheelchair or bed, and unable to care for her personal needs.  (Complaint ¶ 2).  Plaintiff received covered home care services from September 2007, but as of June 17, 2008, plaintiff was denied Medicare coverage, through her provider, the Visiting Nurse Association of Southeastern Connecticut ["VNA"], and Aetna, for her home health care on the ground that her condition was stable.  (Complaint ¶¶ 2, 14-22).  Plaintiff's home health care coverage was terminated despite her doctors' repeated confirmation of her need for care.  (See Complaint ¶¶ 15, 26-29, 31).  Plaintiff appealed the termination decision to an administrative law judge ["ALJ"], who scheduled a hearing for August 14, 2008, but a successful ruling by the ALJ would not reinstate her care because the certification period for that coverage ended on August 15, 2008. (Complaint ¶ 24).  Accordingly, plaintiff commenced this action on July 31, 2008 seeking declaratory, injunctive, and mandamus relief (Dkt. #1), along with a Motion for TRO pursuant to Fed. R. Civ. P. 65, prohibiting defendant, successors, agents, contractors, employees and all persons acting in concert from continuing to deny home health coverage to plaintiff.  (Dkt. #4).  In her Complaint, plaintiff asserted two causes of action: (1) improper application of Medicare law to deny plaintiff coverage as

---

[5]Attached to plaintiff's reply brief is a Revised Appendix and a Supplemental Declaration of Attorney Deford, sworn to August 20, 2011, along with additional time sheets.

even under the "erroneous standard employed by the Secretary through his agents, plaintiff is entitled to Medicare coverage of her home health needs because her condition is not in fact stable and skilled nursing care is medically necessary due to her changing, deteriorating condition[]"; and (2) a violation of 42 U.S.C. § 1395f(a)(2)(C) of the Medicare statute,[6] 42 C.F.R. § 409.44(b)(3)(iii) of the Medicare regulations,[7] and the Medicare Benefit Policy Manual, CMS Pub. 100-02, ch.7, § 40.1.1.[8] (Complaint ¶¶ 34-35).

As stated above, on August 1, 2008, Judge Nevas  granted plaintiff's Motion for a TRO, effective from August 1, 2008 to August 18, 2008, on grounds that plaintiff's eligibility for home health care services through defendant's Medicare Part C program was:

> demonstrated both because the Secretary [was] incorrect to view [plaintiff's] condition as stable and because the strict [stablity][9] standard applied by the Secretary [was] contrary to Medicare policy and, in judging [plaintiff's] need for skilled nursing care for her unique situation, it [was] apparent, as her doctors have shown, that [plaintiff] needs skilled nursing care.

(Dkt. #5, at 1-2; see Dkt. #6; Dkt. #52, at 7-8 & n.2)(footnote added).

Twenty-one days later, plaintiff filed a Motion for Preliminary Injunction (Dkts. ##7-9), in which plaintiff noted that pursuant to Judge Nevas' Order on plaintiff's Motion for TRO,

---

[6]42 U.S.C. § 1395f(a)(2)(C) reads: payment for services may be made to physicians who certify that such home health care services were required "because the individual is or was confined to his home . . . and needs or needed skilled nursing care . . . ."

[7]42 C.F.R. § 409.44(b)(3)(iii) of the Medicare regulations reads: "The determination of whether skilled care is reasonable and necessary must be based solely upon the beneficiary's unique condition and individual needs, without regard to whether the illness or injury is acute, chronic, terminal or expected to last a long time."

[8]The Medicare Benefit Policy Manual, CMS Pub. 100-02, ch. 7, § 40.1.1. repeats the language of 42 C.F.R. § 409.44(b)(3)(iii) and adds: "In addition, skilled care may, dependent upon the unique condition of the patient, continue to be necessary for patients whose condition is stable."

[9]While the text of the TRO reads "liability[,]" the word that logically replaces this typographic error is "stability".  (Dkt. #52, at 8, n. 2).

plaintiff's Medicare home health coverage was reinstated on August 6, 2008 and would be continued to September 4, 2008 by agreement of the Aetna Medicare Advantage plan (Dkt. #7, Brief at 6, Sheehan Second Aff't ¶ 11 &  Exh. F), but the parties were not able to agree on an extension of coverage beyond September 4, and thus plaintiff sought continued relief through the pendency of her litigation.  On August 27, 2008, plaintiff moved for an extension of the TRO as, at that time, the parties had not been able to agree on an extension of coverage beyond September 4, 2008, and plaintiff's Motion for Preliminary Injunction was not scheduled to be heard by the Court prior to September 4, 2008. (Dkts. ##11-12).[10]

On September 2, 2008, defendant filed a Motion to Dismiss and brief in opposition to plaintiff's Motion for Preliminary Injunction on grounds that the Court lacked subject matter jurisdiction as plaintiff failed to satisfy the presentment and exhaustion requirements of the Medicare statute, 42 U.S.C. § 1395w-22(g)(5); specifically, plaintiff failed to exhaust her administrative remedies in that she appealed the VNA's June 13, 2008 non-coverage decision to an ALJ, but the ALJ had yet to issue a decision; and plaintiff failed to join a necessary party under FED. R. CIV. P. 19, as the decision to deny plaintiff Medicare coverage for home health services was made by Aetna and its contract provider, the VNA.  (Dkts. ##13-15).[11]  Seven days later, plaintiff filed her reply brief to her Motion for Preliminary

_____

[10]Thereafter, "[b]y agreement of the parties, the defendant Secretary's Medicare coverage of the home health care services provided pursuant to [the TRO] [w]as . . . continued through September 18, 2008" and consequently, plaintiff's Motion for Extension of the Temporary Restraining Order was taken off the Court's calendar for hearing on September 4, 2008.  (Dkt. #16, at 1 & n.1).

[11]According to defendant, "[i]n the meantime, as . . . defendant had been ordered to continue home health benefits for [eighteen] days - - an act which was solely within the control of the non-party insurer Aetna, not defendant - - government counsel contacted Aetna's legal counsel and informed them of the temporary restraining order."  (Dkt. #55, at 4).  Additionally, government counsel "requested Aetna continue home health benefits from August 1, 2008 to August 18, 2008," as ordered by the Court.  (Id.).

Injunction in which she argued, <u>inter alia</u>, that "[t]he entire point of this lawsuit and of the requests for temporary and preliminary relief, and ultimately for permanent relief, is to <u>maintain</u> the status quo, which is the Medicare coverage for home health care services that [plaintiff] has been receiving and needs to continue to receive." (Dkt. #16, at 2)(emphasis in original).  On September 12, 2008, the parties held a conference with Judge Nevas, during which "the Secretary agreed to extend [p]laintiff's home health coverage until October 10, 2008[,]" and "[f]urther discussions between the parties led to an agreement that home health care coverage would continue to be extended as long as her doctor issued the appropriate orders every sixty days.  (Dkt. #38, at 1-2; <u>see</u> Dkt. #55, at 4).

On December 30, 2008, counsel submitted a Joint Statement of Counsel, in which they informed the Court that the "skilled nursing portion of [plaintiff's] care has remained in place as ordered by her physician and has been paid for by [p]laintiff's Medicare Advantage plan[,]" and the VNA informed plaintiff that it would be unable to increase the home health services from three times a week to five times a week until January 2009, as plaintiff's physician ordered.  (Dkt. #29, at 1).  As stated above, three days after the case was transferred to Judge Arterton on February 24, 2009, the Judge issued an order withdrawing plaintiff's Motions for Preliminary Injunction and TRO "without prejudice to renew at any time[,]" an Order of Dismissal entered, and defendant agreed to withdraw her Motion to Dismiss.  (Dkts. ##31, 34-35;Dkt. #52, at 9; Dkt. #55, at 4-5).[12]

Plaintiff died on December 14, 2010 (Dkt. #38, at 2; <u>see also</u> Dkt. #42), and on or about May 27, 2011, a probate proceeding was opened on plaintiff's behalf at the Windham-

---

[12]According to Attorney Sheehan, plaintiff's coverage continued and Sheehan "continued to provide legal services to [plaintiff and her] family," including "monitoring the situation to ensure that [plaintiff] received the coverage and care from Aetna and the VNA that was authorized by her doctor."  (Dkt. #52, at 9 & Exh. 5, Sheehan Aff't ¶ 6).

Colchester Probate Court. (Id.). In plaintiff's June 9, 2011 Motion to Restore the Case to the Active Docket, which was the first filing in more than two years since the case was dismissed, plaintiff stated that she was "seeking to restore this matter to the active docket in order to seek fees, costs, and expenses for her attorneys' work[.]" (Dkt. #38, at 3). As discussed above, the case was reopened over defendant's objection (Dkt. #41; see Dkt. #39), and ultimately, the pending motion followed.

## II. DISCUSSION

A party who prevails in a civil action against the United States may seek an award of fees and costs under the Equal Access to Justice Act ["EAJA" or "Act"], 28 U.S.C. § 2412, the purpose of which Act is "to eliminate for the average person the financial disincentive to challenging unreasonable government actions." Comm'r, I.N.S. v. Jean, 496 U.S. 154, 163 (1990)(footnote & citation omitted)["Jean"]. In order for an award of attorney fees to enter, this Court must find that plaintiff is a prevailing party, that the Commissioner of Social Security's opposition to the original motion to remand was without substantial justification, that no special circumstances exist that would make an award unjust, and that the fee petition was filed within thirty days of final judgment. 28 U.S.C. § 2412(d)(1)(B)-(D).

### A. SUBJECT MATTER JURISDICTION

As an initial matter, defendant contends that this Court lacked jurisdiction over this matter due to plaintiff's failure to satisfy the exhaustion and presentment requirements established under the Medicare Act, which argument was made in defendant's Motion to Dismiss. (Dkt. #55, at 6-7).[13] As noted above and discussed below, defendant withdrew this

---

[13]In a case such as this, subject matter jurisdiction is conferred through 42 U.S.C. § 405(g) which provides for judicial review "after any final decision of the Secretary made after a hearing to which . . . [the claimant] was a party." There are two elements to the "final decision" component: (1) plaintiff must have presented a claim for benefits; and (2) plaintiff exhausted the administrative

Motion to Dismiss, and <u>at no time</u> refiled such motion, thereby withdrawing her pursuit of contesting jurisdiction over this matter and the Court need not address defendant's jurisdictional challenge in the context of an attorney's fees application.

B. TIMELINESS

Plaintiff contends that this application has been timely filed within thirty days of the Court's final judgment as the order of dismissal was entered on July 28, 2011, and plaintiff had ninety days after that date, until October 26, 2011, to file this petition.  28 U.S.C. §§ 2412(d)(1)(B), 2412(d)(2)(G).  (<u>See also</u> Dkt. #52, at 10; <u>see</u> Dkt. #50).  Conversely, defendant argues that a voluntary dismissal, which entered on February 27, 2009, is the "final judgment" from which plaintiff had thirty days to file the pending application.  (Dkt. #55, at 7-10; <u>see</u> Dkt. #35).  In her reply brief, plaintiff responds that it would have been "premature[]" for her to have filed this motion any sooner, "because further action on the merits was entirely possible . . ." and it took several months to file the estate in the probate court.  (Dkt. #58, at 3-4).

As stated by Judge Arterton on the record at the July 22, 2011 telephone status conference, this case was "administratively closed in [2009] with either side having an absolute right to reopen it[.]" (Dkt. #59, at 2).  Judge Arterton continued, "either side [had] an absolute right to reopen it, and that [is] really . . . the critical condition for an administrative closure, so that nobody is prejudiced by it[,] but it [does not] remain on the active docket . . . ."  (<u>Id.</u>).  When plaintiff's counsel represented that he sought to reopen

_____

review procedures prescribed by the Secretary. <u>Mathews v. Eldridge</u>, 424 U.S. 319, 328-30 (1976); <u>Weinberger v. Salfi</u>, 422 U.S. 749, 764-66 (1975).  The exhaustion requirement may be waived by the Secretary, or, under appropriate circumstances, by the court.  <u>Mathews</u>, 424 U.S. at  328; <u>City of New York v. Heckler</u>, 742 F.2d 729, 736 (2d Cir. 1984), <u>aff'd sub nom. Bowen v. City of New York</u>, 476 U.S. 467 (1986).  However, the presentment requirement may not be waived. <u>Mathews</u>, 424 U.S. at 329-30.

the case, <u>inter alia</u>, to seek attorney's fees (<u>id.</u> at 3-4), defense counsel objected on the basis of timeliness, asserting, as he does here, that any motion for attorney's fees should have been filed within thirty days after the first order of dismissal.  (<u>Id.</u> at 4-5, 8, 9-10).   The deadlines were then set so that the lawsuit would be dismissed under F<small>ED</small>. R. C<small>IV</small>. P. 41(a)(2), and plaintiff would thereafter file her Motion for Attorney's Fees, with timeliness being one of the issues to be adjudicated.  (<u>Id.</u> at 5–11).

Plaintiff is correct that the case upon which defendant relies, <u>Poff v. Gorsuch</u>, 636 F. Supp. 710, 712 (W.D. Va. 1986) is inapposite in that in <u>Poff</u>, unlike here, a Rule 41(a)(2) dismissal was entered, despite the parties continuing to engage in settlement discussions. (<u>See</u> Dkt. #55, at 7-10; Dkt. #58, at 2-3).   In this case, no such dismissal was entered. Instead, here plaintiff passed away in December 2010; several months transpired in which to open up a probate estate; in early June 2011 plaintiff filed her Motion to Reopen Case; in early July 2011, plaintiff filed her Suggestion of Death and Motion to Substitute Party Plaintiff; and in late July 2011, the parties filed their Consent Motion to Dismiss.  Under these unique circumstances, the operative date for triggering the thirty day deadline under EAJA is, as plaintiff argues, the Order of Dismissal filed on July 28, 2011, and not the administrative closing on February 27, 2009.

C. PREVAILING PARTY

The issue of "prevailing party" status as it exists in this case was summarized by the U.S. Supreme Court in <u>Buckhannon Bd. and Care Home, Inc. v. W. Va. Dept. of Health & Human Res.</u>, 532 U.S. 598, 600 (2001):

> Numerous federal statutes allow courts to award attorney's fees and costs to the "prevailing party."  The question presented here is whether this term includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a <u>voluntary</u> change in the defendant's

conduct. We hold that it does not.

(emphasis added).[14]    In so ruling, the U.S. Supreme Court in <u>Buckhannon</u> rejected the

"'catalyst theory' which posits that a plaintiff is a 'prevailing party' if it achieves the desired

result because the lawsuit brought about a voluntary change in the defendant's conduct."

<u>Id.</u> at 601.  The "catalyst theory" was rejected because it "allows an award where there is

no judicially sanctioned change in the legal relationship of the parties." <u>Id.</u> at 605.

The Second Circuit has held that prevailing party status is conferred whenever there

is a "material alteration of the legal relationship of the parties" or a "a court-ordered change

in the legal relationship between the plaintiff and the defendant." <u>Pres. Coalition of Erie</u>

<u>County v. Fed. Transit Admin.</u>, 356 F.3d 444, 451 (2d Cir. 2004),[15] <u>citing Buckhannon</u>, 532

U.S. at 604 (additional citation, internal alterations & internal quotations omitted).  More

specifically, "[t]he Second Circuit has interpreted the rule in <u>Buckhannon</u> to permit parties

to prevail when they have achieved such a change through the issuance of a stay, a

preliminary injunction, or a court order directing a defendant to be released on bail." <u>Bolling</u>

<u>v. Bd. of Educ. of the City of Ansonia</u>, No. 3:07 CV 1593(JCH), 2008 WL 349765, at *1 (D.

Conn. Feb. 5, 2008), <u>citing Vaccio v. Ashcroft</u>, 404 F.3d 663, 673 (2d Cir. 2005).[16]  "In

_____

[14]While <u>Buckhannon</u> involved claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et seq.</u>, and the Fair Housing Amendments Act, 42 U.S.C. § 3601 <u>et seq.</u>, the Second Circuit has recognized that <u>Buckhannon's</u> definition of "prevailing party" applies to fee requests under the EAJA. <u>Ma v. Chertoff</u>, 547 F.3d 342, 344 (2d Cir. 2008)(multiple citations omitted).

[15]In this case, like in <u>Pres. Coalition</u>, plaintiff sought an injunction and writ of mandamus; however, in <u>Pres. Coalition</u>, the Court declined to order such injunction.  356 F.3d at 448.  Three months after the Court's decision, the parties presented the Court with a settlement agreement, stipulation and proposed order.  <u>Id.</u> at 448-49.

[16]In contrast, the D.C. Circuit, as well as the First, Third, Fourth, Sixth, Eighth and Ninth Circuits, have held that when a preliminary injunction only grants temporary relief preserving the status quo, "prevailing party" status is not conferred, because such a preliminary injunction is not a judicially sanctioned material alteration of the parties' legal relationship. <u>Advanced Sys. Tech., Inc.</u> <u>v. U.S.</u>, 74 Fed. Cl. 171, 176 (Fed. Cl. 2006)(<u>citing</u> <u>N. Cheyenne Tribe v. Jackson</u>, 433 F.3d 1083,

applying the prevailing party standard, it is helpful to identify the relief sought by the plaintiff and compare it with the relief obtained as a result of the suit." Christopher P. v. Marcus, 915 F.2d 794, 804 (2d Cir. 1990)(citations omitted), cert. denied, 498 U.S. 1123 (1991). "When a party receives a stay or preliminary injunction but never obtains a final judgment, attorney's fees are proper if the court's action in granting the preliminary injunction is governed by its assessment of the merits." Vacchio, 404 F.3d at 673, citing Haley v. Pataki, 106 F.3d 478 (2d Cir. 1997).

Addressing the merits of plaintiff's claim, plaintiff sought to reverse the decision of defendant denying plaintiff home health coverage and prohibiting defendant from denying such coverage as defendant's policy of denying coverage on the ground that the beneficiary's condition is clinically stable violated the Medicare statute, the regulation, and the Medicare Policy Manual. (Dkt. #1). In the TRO, Judge Nevas held that "plaintiff has demonstrated that she will suffer irreparable harm if she continues to be deprived of the home health care coverage provided by the defendant[,]" and "she has shown sufficiently serious questions going to the merits to make them a fair ground for litigation," such that "a balance of hardships tip decidedly in her favor, in that the skilled nursing care available through the home health care services authorized by the defendant's Medicare Part C program is

---

1086 (8th Cir. 2006)("Congress intended to permit the . . . award of counsel fees only when a party has prevailed on the merits of at least some of his claims. For only in that event has there been a determination of the 'substantial rights of the parties.' ")(quoting Hanrahan v. Hampton, 446 U.S. 754, 758 (1980)); John T. v. Del. County Intermediate Unit, 318 F.3d 545, 558-59 (3rd Cir. 2003); Dubuc v. Green Oak Township, 312 F.3d 736, 753-54 (6th Cir.2002); Race v. Toledo-Davila, 291 F.3d 857, 858 (1st Cir. 2002)(holding that the plaintiff was not a prevailing party where the District Court intended merely to safeguard the plaintiff's rights under the Americans with Disabilities Act while the plaintiff exhausted his administrative remedies, and the District Court did not address the merits of the claim.); Smyth v. Rivero, 282 F.3d 268, 276-77 (4th Cir. 2002), cert. denied, 537 U.S. 825 (2002)("The fact that a preliminary injunction is granted in a given circumstance, then, by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the deliberate investigation that follows the granting of the preliminary injunction.").

medically reasonable and necessary and that she is eligible for that care." (Dkt. #5, at 1).

Judge Nevas continued, "[plaintiff's] eligibility is demonstrated both because the Secretary

is incorrect to view her condition as stable" and "in judging her need for skilled nursing care

. . . it is apparent . . . that she needs skilled nursing care." (Id. at 1-2).  Further, Judge

Nevas concluded that the "strict [stability] standard"[17] applied by defendant which is

challenged by plaintiff in this action, "is contrary to Medicare policy[.]" (Id. at 1).  The explicit

language of the TRO makes clear that Judge Nevas considered the merits and in doing so,

based his decision on "a strong showing of irreparable harm and a likelihood of success on

the merits."   Vacchio, 404 F.3d at 673 (internal quotations & citation omitted).

While defendant relies on Christopher P. to support her position that "prevailing

party" status is not conferred when a preliminary injunction only grants temporary relief

preserving the status quo, see Christopher P., 915 F.2d at 805 ("[T]he procurement of a TRO

in which the court does not address the merits of the case but simply preserves the status

quo to avoid irreparable harm to the plaintiff is not by itself sufficient to give a plaintiff

prevailing party status"), this case is distinguishable as Judge Nevas ordered that plaintiff

receive at home care, rather than preserve the status quo which, at that time, was that

plaintiff did not qualify for the home care her doctors opined she needed. Conversely, in

Christopher P., "[t]he court granted the TRO without addressing the merits which neither

side briefed, solely to preserve the status quo, allowing Christopher to continue his education

at [his current] school until the court could rule on the merits of the plaintiffs' claims." 915

F.2d at 805.  This case is more akin to Bolling, wherein Judge Hall found that the TRO issued

by the court fell "squarely into the category of 'interim judicial relief,'" as the order reversed

---

[17]See note 9 supra.

the status quo and required defendants to permit plaintiff's son to return to school. Furthermore, in this case, Judge Nevas' order entered after he held a hearing on plaintiff's Motion for TRO, at which both parties were represented, and Judge Nevas explicitly stated that he based his ruling on plaintiff's likelihood of success on the merits.

Plaintiff's coverage terminated in June 2008 and plaintiff did not receive home health services after June 13, 2008.  (Dkt. #58, at 4; Dkt. #4, Exh. 3, Plaintiff Decl. ¶ 17).  The TRO issued by Judge Nevas "certainly altered the legal relationship between the parties . . . by reversing the status quo and requiring" plaintiff receive the benefit she sought by bringing this lawsuit, Bolling, 2008 WL 349765, at *1, as the lack of coverage and home health services was causing plaintiff's condition to deteriorate, and would have "forced her, if [she was] to have the necessary care, to go to a skilled nursing facility." (Dkt. #58, at 4; Dkt. #4, Exh. 3, Plaintiff Aff't ¶¶  23, 30).

Defendant relies on Ma v. Chertoff, 547 F.3d 342, 344 (2d Cir. 2008) in support of her argument that plaintiff is not a "prevailing party," but defendant's argument in misplaced as the facts in Ma are significantly distinguishable from this case.  In Ma, plaintiff commenced an action for declaratory judgment and mandamus to compel an adjustment in his status to lawful permanent resident, claiming that the United States Citizenship and Immigration Services["CIS"] erroneously denied his application for permanent resident status.  547 F.3d at 343.  The case was dismissed as moot shortly after defendants reported to the Court that, in response to the Court's order to show case, CIS adjusted Ma's status to that of a lawful permanent resident in accordance with his request, and provided him with a temporary green card until his permanent green card was processed.  Id.  Unlike in this case, there was no injunctive relief, temporary or permanent, ordered by the court.  The Second Circuit, affirming the decision of United States District Judge Mark R. Kravitz, held that because

14

defendants voluntarily gave Ma the relief he sought, Ma "clearly does not fit the definition of a 'prevailing party'" under <u>Buckhannon</u>, and thus plaintiff was not eligible for an award of fees and costs under the EAJA.  <u>Id.</u> at 344.

Even after a hearing was held at which defendant was represented, and after Judge Nevas issued the TRO in which he noted his "full[ ] consider[ation of] the written and oral arguments of the parties[]" (Dkt. #5, at 1), defendant contends that the grant of the TRO "erroneously ordered . . .  defendant to continue home health benefits for [eighteen] days, an act which was completely beyond . . . defendant's control and solely within the control of the non-party insurer Aetna." (Dkt. #55, at 14).[18] Defendant chose her litigation strategy as she had every right to do, and the result of such strategy was that while defendant claims that she essentially served as the intermediary, conveying such order to Aetna "in an attempt to avoid future contempt charges," it was defendant who was the subject of the Court's order, and legally bound by its terms.  (<u>Id.</u>; <u>see</u> Dkt. #5).[19]

---

[18]Although defendant asserts that Judge Nevas' order was "erroneous" as it was Aetna and not defendant who was in control of continuing plaintiff's home health benefits, the record does not reflect that defendant ever sought to implead Aetna under Federal Rule of Civil Procedure 14(a). Rule 14(a)(1) provides in part: "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."  As the Second Circuit has noted,

> [t]o sustain an impleader action, the third-party defendant . . . must be liable secondarily to the original defendant, or . . . the third party . .. must necessarily be liable over to the defendant . . . for all or part of the plaintiff's . . . recovery, or . . . the defendant . . . must attempt to pass on to the third party . . . all or part of the liability asserted against the defendant. . . .

<u>Bank of India v. Trendi Sportswear, Inc.</u>, 239 F.3d 428, 438 (2d Cir. 2000)(internal quotation marks omitted).

Defendant asserts that plaintiff "refused to implead Aetna as the proper party defendant[]" and that government counsel informed Aetna's counsel of the "likelihood of defendant impleading Aetna into this lawsuit."  (Dkt. #55, at 14).

[19]<u>See also</u> (Dkt. #55, Exhs. B-C)(in correspondence from Aetna's Paula Sherrod to Catherine Fuller, the Administrative Law Judge, Sherrod notes that "Aetna, <u>at the request of the</u>

Defendant filed a Motion to Dismiss for Lack of Jurisdiction and Failure to Join a Required Party under Rule 19(a) (Dkt. ##13-14), but on November 5, 2008, counsel reported to the Court that there was "no need to go forward [with the Motion to Dismiss]" (Dkt. #26); in January 2009, defendant agreed to postpone a ruling on such motion (Dkt. #30); and after the case was transferred to Judge Arterton a month later, defendant agreed to withdraw her motion and further agreed to an administrative dismissal of the case. (Dkt. #35; <u>see</u> Dkt. #52, at 9; Dkt. #55, at 4-5).  Moreover, in her objection to plaintiff's Motion to Restore this Case to the Active Docket, defendant represented that "[s]hould the Court . . . restore the case to the active docket, defendant will immediately refile [her] [M]otion to [D]ismiss and vigorously contest plaintiff's motion for attorney's fees."  (Dkt. #39, at 3). Defendant did not refile such motion.

In support of her argument for entitlement of fees from the commencement of this action to the present, plaintiff contends that at no time did defendant seek reconsideration of or appeal the Court's order.  (Dkt. #58, at 3).  Although an order granting or denying a TRO is "ordinarily not appealable" as the grant or denial of an injunction under 28 U.S.C. § 1291(a)(1), <u>First Eagle SoGen Funds, Inc. v. Bank for Int'l Settlements</u>, 252 F.3d 604, 607 (2d Cir. 2001), <u>citing Office of Pers. Mgmt. v. Am. Fed. of Gov't Employees, AFL-CIO</u>, 473 U.S. 1301, 1303-04 (1985)(quotations & additional citation omitted), at no time after the eighteen days initially ordered by Judge Nevas did defendant seek reconsideration or appeal of the injunctive relief.  28 U.S.C. § 1291(a)(1)("[i]nterlocutory orders of the district courts . . . granting, continuing, modifying . . . .injunctions, or refusing to dissolve or modify injunctions" are appealable).  However, after the expiration of the eighteen day TRO order,

---

<u>Secretary of HHS</u>, has authorized" home care through September 4, 2008.)(emphasis added).

there was no injunctive relief order issued by the Court, and thus after the expiration of the TRO, there was no Court order from which to seek such reconsideration or appeal.  After the issuance of the eighteen day TRO, plaintiff filed a Motion for Preliminary Injunction, followed by a Motion for Order Extending the TRO (Dkts. ##7-9, 12; see Dkts. ##15-18, 21), neither of which resulted in the entry of orders by the Court.  The docket sheet reflects that a hearing on plaintiff's Motions for Preliminary Injunction and an Extension of the TRO was scheduled for September 4, 2008 (Dkt. #11), however, there is no Court entry explaining why such hearing did not take place.

Defense counsel contends that prior to the hearing on the preliminary injunction, Aetna, "not at the direction of the defendant, changed its position and agreed to continue home health coverage to plaintiff indefinitely." (Dkt. #55, at 14)(emphasis in original). Defense counsel insists that "defendant played no role in Aetna's decision to continue [plaintiff's] home health coverage indefinitely[,]" "[o]ther than informing Aetna of [defendant's] planned course of action."  (Id.).  In an e-mail to defense counsel from plaintiff's counsel, dated October 17, 2008, plaintiff's counsel expressed her "appreciat[ion] [for defense counsel's] efforts in helping us reach [a] settlement."  (Dkt. #55, Exh. A)(emphasis added).  In this e-mail, plaintiff's counsel stated that she had spoken with "Dr. Jesse Samuels at Aetna" and "[a]ccording to him, [plaintiff] has a 'fee for service' type Medicare Advantage plan, which he says is unusual and makes a difference in her case[ ]" as "this type of plan does not require the VNA to seek Aetna's approval to provide services." (Id.).  Plaintiff's counsel continued: "Basically, going forward [plaintiff] is getting everything she needs - - [Dr. Samuels at Aetna] really feels for this lady and wants her to get the care[,]" and "Dr. Samuels said he didn't see any reason why he or [plaintiff's counsel] would need to get involved with [plaintiff's] home health care coverage in the future[]" as "all that's

necessary going forward is for [plaintiff's doctor] to write orders every [sixty] days." (Id.). This ultimate resolution of this matter as it existed until plaintiff's death resulted from an interpretation of plaintiff's Medicare Advantage plan, and not from the substance of Judge Nevas' TRO order. After the TRO order was issued and expired, plaintiff went on to benefit from a "voluntary change" in defendant's conduct, or, in the words of plaintiff's counsel, a "settlement" was reached going forward which allowed for plaintiff to receive the continued care she sought from this action. Buckhannon, 532 U.S. at 605. This voluntary resolution is reflected in the same status conference in which counsel reported to Judge Nevas that there was "no need to go forward on the [Motion to Dismiss,]" wherein counsel also reported that there was "no need to go forward on . . . [the] [p]reliminary injunction[,]" as at that point, Aetna was voluntarily providing plaintiff with the care she sought by bringing this litigation. (Dkt. #26). Accordingly, plaintiff's "prevailing party" status is limited to the time period encompassed in Judge Nevas' TRO order, as shortly upon expiration thereof, plaintiff received the benefit of a voluntary change in Aetna's position when counsel reported between themselves that they had reached a "settlement." Thus, plaintiff is entitled to attorney's fees only until October 17, 2008, when a settlement was reached between plaintiff and Aetna, and defendant's further participation in this litigation was merely to facilitate closure of the file, and for this attorney's fees application.

## D. SUBSTANTIALLY JUSTIFIED

The EAJA provides for an award of attorney's fees to a prevailing party, unless "the court finds that the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A). As defined by the U.S. Supreme Court, the term "substantially justified" is "justified in substance or in the main--that is, justified to a degree that could satisfy a reasonable person." Jean, 496 U.S. at 158, n.6 (citation omitted). The Government "must

demonstrate that its position had a reasonable basis in both law and fact." <u>Vacchio</u>, 404 F.3d at  674 (internal quotations & citation omitted).   The court must then review both "the position taken by the United States in the civil action," as well as "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D); <u>see Jean</u>, 496 U.S. at 159.

Defendant, who bears the burden of proof on this issue, <u>Vacchio</u>, 404 F.3d at 674, contends: (1) her position was substantially justified as defendant had no part in denying payment of plaintiff's home health care benefits afforded under Medicare Part C Advantage Health Plan administered by Aetna; (2) defendant has maintained that she was not the proper party to this lawsuit; (3) plaintiff offers no evidence that defendant knew plaintiff's home health services had been discontinued or that defendant engaged in the practice of applying the so-called Improvement Standard; (4) defendant did not defend the merits of Aetna's initial non-coverage determination and to deny coverage solely on a beneficiary's lack of potential for improvement would have been contrary to the explicit provisions in the Secretary's own regulations and policy manual; and (5) the Secretary was reasonable in resisting plaintiff's claim that it is never permissible to consider whether a beneficiary is clinically stable, and the Secretary's position is supported by the explicit language of 42 U.S.C. § 409.33(a)(2)(I), the controlling regulation.  (Dkt. #55, at 21-23).

Plaintiff asserts that defendant's "action and inaction" in continuing to "condone the practice of applying the Improvement Standard to deny or terminate coverage to beneficiaries" is "a particularly callous response" as courts have made it "abundantly clear that the Improvement Standard was impermissible." (Dkt. #52,  at 13-15; <u>see also</u> Dkt. #58, at 5-6).  Moreover, as just stated above, 28 U.S.C. § 2412(d)(2)(D) explicitly provides that "'position of the United States' means, <u>in addition to the position taken by the United States</u>

19

<u>in the civil action</u>, the action or failure to act by the agency upon which the civil action is based. . . ."

In this case, as discussed above, defendant filed a detailed Motion to Dismiss, but withdrew such motion after a voluntary resolution was reached that provided plaintiff with the outcome sought in this litigation, and despite her articulation that she planned to do otherwise, defendant did not refile this motion when given the opportunity by Judge Arterton to do so.  In light of the unusual history of this case, defendant cannot meet her burden of a "strong showing" that her litigation position was "substantially justified."

### E. SPECIAL CIRCUMSTANCES

An award of fees under the EAJA may be denied if the court finds that "special circumstances make an award unjust."  42 U.S.C. § 2412(d)(1)(A).  "[T]he legislative history of the EAJA recognizes that the 'special circumstances' clause" includes a "safety valve" which

> helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of law that often underlie vigorous enforcement efforts. It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made.

<u>Nken v. Holder</u>, 385 Fed. Appx. 299, 302 (2d Cir. 2010), <u>quoting</u> H.R. Rep. No. 96-1418, at 11 (1980), 1980 U.S.C.C.A.N. 4984, at 4990.  In light of the conclusion reached in Section C. <u>supra</u>, wherein the award of fees is limited to the period prior to the voluntary resolution of this matter that occurred after the entry and expiration of the TRO, which Judge Nevas granted after an assessment the merits of plaintiff's claims and granted such order against <u>defendant</u>, defendant fails to satisfy her burden to demonstrate that special circumstances exist that make this limited award unjust.

### F. CALCULATION OF THE FEE AWARD

To calculate a fee award, "courts traditionally employed the 'lodestar' method: first

the court multiplied a reasonable number of hours worked by a reasonable hourly rate to calculate the 'lodestar' amount, and then adjusted the lodestar amount up or down based on case-specific factors." Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth., No. 3:03 CV 599(CFD), 2011 WL 721582, at *3 (D. Conn. Feb. 22, 2011)(citation omitted). However, the lodestar method has since been abandoned by the Second Circuit, Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2008), and in doing so, the Second Circuit has instructed the district courts to "first determine a 'reasonable hourly rate,' based on case-specific variables, and then multiply that rate by the number of hours reasonably expended to arrive at a 'presumptively reasonable fee.'" Bridgeport & Port Jefferson, 2011 WL 721592, at *3, quoting Arbor Hill, 522 F.3d at 190. The amount is "only presumptively reasonable"; it is still within the court's discretion to adjust the amount upward or downward based on the case-specific factors. See Robinson v. City of NY, No. 05 Civ. 9545(GEL), 2009 WL 3109846, at *3 (S.D.N.Y. Sept. 29. 2009)(citation omitted). "Hence, the process is really a four-step one, as the court must: (1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiple the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award." Adorno v. Port Auth. of NY & NJ, 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010).

The U.S. Supreme Court has held that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained[,]" and where a plaintiff achieves "only partial or limited success," an adjustment may be made, "even when the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." Hensley v. Eckerhart, 461 U.S. 324, 436 (1983). As the Supreme Court has noted, "[a] request for attorney's fees should not result in a second major litigation." Id. at 437.

1. REASONABLE HOURLY RATE

Pursuant to the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justified a higher fee . . . ." 28 U.S.C. § 2412(d)(2)(A).  While the "cost of living" is not defined by the EAJA, such rate is properly measured by the Consumer Price Index ["CPI"].  See Barwari v. Mukasey, 282 Fed. Appx. 896, 899 (2d Cir. 2008), citing Harris v. Sullivan, 968 F.2d 263, 264-66 (2d Cir. 1992)(holding that "cost of living" is not defined in EAJA and is "properly measured by the CPI").  However, "[a] district court has discretion whether to grant cost of living increase in statutory hourly rate cap for an attorney fee award under the EAJA, and the increase in the consumer price index does not mandate an increase."  Green-Younger v. Barnhart, 3:99 CV 1425(CFD), 2004 WL 2377224, at *5 (D. Conn. Sept. 30, 2004)(citations omitted).  In this case, defendant does not contest the hourly rates sought by counsel and thus the Court accepts the hourly rate of $176.25 for 2008 and 2009, $180 for 2010, and $183.75 for 2011. (Dkt. #52, at 18 & n.7; Dkt. #56, at 26-27; Dkt. #58, at 7, n.3).

2. REASONABLE NUMBER OF HOURS

This Court has a duty to review plaintiff's itemized statement to determine the reasonableness of the hours requested.  Hensley, 461 U.S. at 433-34.  In her filings, plaintiff seeks a total of $77,968.61 in attorney's fees for five attorneys employed by the Center for Medicare Advocacy – Gill Deford and Margaret Murphy, who performed work on this file in 2008, 2009, and 2011; Abigail C. Sheehan, who performed work in 2008, 2009, 2010, and 2011; Judith A. Stein, who performed work in 2008 and 2009; and Nancy Gifford, who performed work in 2011 only. (Dkt. #52, at 17-19, Appendix, & Exhs. 2-6; Dkt. #58, at 7-10, Revised Appendix, and Supplemental Deford Aff't, with time sheets).  The total sought is

summarized in Table 1.A through Table 1.G below:

### TABLE 1.A – ATTORNEY DEFORD

| Year | Hours Billed | Hourly Rate | Fees Sought |
|------|-------------|-------------|-------------|
| 2008 | 114.0* | $176.25 | $19,563.78* |
| 2009 | 3.0 | $176.25 | $528.75 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 37.1 | $183.75 | $6,817.13 |
| Subtotal | 154.1 | | $26,909.66 |

### TABLE 1.B – ATTORNEY MURPHY

| Year | Hours Billed | Hourly Rate | Fees Sought |
|------|-------------|-------------|-------------|
| 2008 | 148.5** | $176.25 | $25,908.77** |
| 2009 | 29.1** | $176.25 | $4,864.52** |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 1.1 | $183.75 | $202.13 |
| Subtotal | 178.7 | | $30,975.42 |

### TABLE 1.C – ATTORNEY SHEEHAN

| Year | Hours Billed | Hourly Rate | Fees Sought |
|------|-------------|-------------|-------------|
| 2008 | 40.0** | $176.25 | $6,785.64** |
| 2009 | 11.6 | $176.25 | $2,044.50 |
| 2010 | 3.0 | $180.00 | $540.00 |
| 2011 | 1.2 | $183.75 | $220.50 |
| Subtotal | 55.8 | | $9,590.64 |

**TABLE 1.D – ATTORNEY STEIN**

| Year | Hours Billed | Hourly Rate | Fees Sought |
|---|---|---|---|
| 2008 | 43.3** | $176.25 | $7,367.27** |
| 2009 | 2.2 | $176.25 | $387.75 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 0.0 | $183.75 | $0.00 |
| Subtotal | 45.5 | | $7,755.02 |

**TABLE 1.E – ATTORNEY GIFFORD**

| Year | Hours Billed | Hourly Rate | Fees Sought |
|---|---|---|---|
| 2008 | 0.0 | $176.25 | $0.00 |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 14.9 | $183.75 | $2,737.88 |
| Subtotal | 14.9 | | $2,737.88 |

\* = 6.0 hours of travel at travel rate of $88.13.

\*\* = 3.0 hours of travel at travel rate of $88.13.

**TABLE 1.F – SUBTOTALS BY ATTORNEY**

| Attorney | Fees Sought |
|---|---|
| Deford | $26,909.66 |
| Murphy | $30,975.42 |
| Sheehan | $9,590.64 |
| Stein | $7,755.02 |
| Gifford | $2,737.88 |
| TOTAL | $77,968.62 |

24

**TABLE 1.G – SUBTOTALS BY YEAR**

| Year | Hours Billed | Hourly Rate | Fees Sought |
|------|-------------:|------------:|------------:|
| 2008 – Non-Travel | 330.8 | $176.25 | $58,303.51 |
| 2008 – Travel | 15.0 | $88.13 | $1,321.95 |
| 2009 – Non-Travel | 42.9 | $176.25 | $7,561.13 |
| 2009 – Travel | 3.0 | $88.13 | $264.39 |
| 2010 | 3.0 | $180.00 | $540.00 |
| 2011 | 54.3 | $183.75 | $9,977.63 |
| TOTAL | 449 | | $77,968.61 |

In light of this Court's conclusion in Section II.C. supra, plaintiff's counsel is entitled to fees from the commencement of this action until the case was reported between counsel as "settle[d,]" which was on October 17, 2008, and reasonable fees incurred by counsel for this pending motion are recoverable.  Rodriguez v. Astrue, 3:08 CV154(JCH)(HBF), 2009 WL 6319262, at *4 (D. Conn. Sept. 3, 2009)("It is undisputed that time expended in establishing a fee is compensable" subject to the same test of reasonableness as all fees claimed under the EAJA)(citation omitted).

That said, with five attorneys from the same advocacy clinic seeking fees, "a district court must account for 'duplicative or repetitive work' to ensure that the shifted fees represent only work that was 'necessary to the litigation and 'a cost efficient use of co-counsel."  Simmonds v. NYC Dept. of Corrections, No. 06 Civ. 5298 (NRB), 2008 WL 4303474, at *6 (S.D.N.Y. Sept. 16, 2008), quoting Sullivan v. Syracuse Housing Auth., No. 89-CV-1205, 1993 WL 147457, at *3 (S.D.N.Y. May 3, 1993).  According to defendant's calculations, with which plaintiff disagrees, defendant was billed 96 hours for time spent in conferences (Attorney Deford – 23.2 hours, Attorney Murphy – 29.3 hours, Attorney Sheehan

– 30.6 hours, Attorney Stein – 11.9 hours, and Attorney Gifford – 1.0 hours), 94.1 hours for drafting the complaint and TRO (Attorney Deford – 24.6 hours, Attorney Murphy – 35.7 hours, Attorney Sheehan – 21.5 hours, and Attorney Stein – 12.3 hours), and 88.1 hours for drafting the brief in support of plaintiff's Motion for Preliminary Injunction, which raised "the same facts, issues, and legal basis" as the TRO (Attorney Deford – 35.8 hours, Attorney Murphy – 38.3 hours, and Attorney Stein – 14.0 hours). (Dkt. #55, at 28-30; but see Dkt. #58 at 8-9).   Defendant is quite correct that the number of hours billed "substantially exceeded what was reasonably required to prosecute [plaintiff's] . . . claims." Simmonds, 2008 WL 4303474, at *7 (citation omitted).  While the factual and legal issues here were not "straightforward[,]" as in Simmonds, id., they did not warrant four attorneys essentially working on this case on a full-time basis.

As plaintiff's exhibits indicate, and especially the Revised Appendix (Dkt.#58, at 13-14), the two primary attorneys on this file were Attorney Deford and Murphy, with Attorney Sheehan and Attorney Stein assuming secondary roles.  Attorney Deford's time sheets and the Revised Appendix reveal that Attorney Deford expended 108.0 hours of non-travel time in this case during 2008.   Despite plaintiff's arguments to the contrary, defendant is correct that Attorney Deford's entries for 2.4 hours on August 13 and 18, 2008 for "legal research on organizational standing" were not relevant to the legal issues in this case.  (Dkt. #55, at 31; Dkt. #58, at 9-10).  In addition to subtracting these 2.4 hours, the Magistrate Judge reduces Attorney Deford"s non-travel time for 2008 by another 5.8 hours, for time expended after October 17, 2008.  Thus, Attorney Deford is entitled to recover for 99.8 hours expended for non-travel time in 2008, at an hourly rate of $176.25, or $17,589.75, in addition to 6 hours of travel time, at an hourly rate of $88.13, or $523.78, for a total of $18,113.53 for 2008.   For the reasons stated in Section II.C. supra, Attorney Deford is not entitled to any

fees in 2009, and has none for 2010.

Attorney Deford also seeks attorney's fees from January 20, 2011 through September 19, 2011 – 20.8 hours from January 20 through August 12, and 16.3 hours from August 15 through September 19, for a total of 37.1 hours.  Of the first 20.8 hours, the Magistrate Judge subtracts 3.4  hours, for the entries on January 20 and 21, February 15, May 26, June 2, 7, 8, 27, 28, and 29, July 6, 12, and 18, as these entries regarded the Motion to Restore to Docket and Amended Complaint, not the Motion for Attorney's Fees.  Therefore, Attorney Deford is entitled to 33.7 hours in 2011, or $6,192.38, for a total of $24,305.91 for 2008 and 2011.

Attorney Murphy's time sheets and the Revised Appendix reveal that Attorney Murphy expended 145.5 hours of non-travel time in 2008. The Magistrate Judge reduces Attorney Murphy's  non-travel time for 2008 by 10.8  hours, for time expended after October 17, 2008.  Thus, Attorney Murphy is entitled to recover for 134.7 hours expended for non-travel time in 2008, at an hourly rate of $176.25, or $23,740.88, in addition to 3 hours of travel time, at an hourly rate of $88.13, or $264.39, for a total of $24.010.27 for 2008.  For the reasons stated in Section II.C. supra, Attorney Murphy is not entitled to any fees in 2009, and has none for 2010.   She is also entitled to 1.1 hours expended in 2011 on attorney's fees, at a rate of $183.75, or $202.13, for a total of $24,212.40 for 2008 and 2011.

As the time sheets of Attorney Sheehan reflect, Attorney Sheehan's 40.0 hours in 2008 consisted almost exclusively of communicating with plaintiff and participating in conferences; while she did draft a limited number of documents, given the substantial hours expended by Attorney Deford and Attorney Murphy on the complaint, Motion for TRO, and Motion for Preliminary Injunction, the interests of justice compel that none of her time spent in 2008 be compensated by defendant.  For the reasons stated in Section II.C. supra,

27

Attorney Sheehan is not entitled to any fees in 2009 and 2010.  In light of this conclusion, plaintiff similarly is not entitled to the 1.0 hour Attorney Sheehan expended in 2011 regarding this pending Motion for Attorney's Fees.

The same conclusion is reached with respect to Attorney Stein, whose time sheets similarly reflect that the 43.3 hours in 2008 consisted primarily of coordinating matters between counsel; similarly, while she did participate in the drafting and revision of the complaint, Motion for TRO, and Motion for Preliminary Injunction, given the substantial hours expended by Attorney Deford and Attorney Murphy on these filings, the interests of justice also compel that none of her time spent in 2008 be compensated by defendant.  For the reasons stated in Section II.C. supra, Attorney Stein is not entitled to any fees in 2009 and she had none in 2010.

Lastly, plaintiff seeks 14.9 hours for Attorney Gifford in 2011 with respect to this pending Motion for Attorney's Fees.  Defendant argues that none of her hours should be permitted.  (Dkt. #55, at 28, n.4).  Only three entries, on May 19, and August 2 and 12, totaling 3.3 hours, relate to this pending motion, so that plaintiff is entitled to $606.38 for Attorney Gifford's time.

<u>3.  PRESUMPTIVELY REASONABLE FEE</u>

As indicated in Sections II.F.1 & 2 supra, multiplying the reasonable hourly rate by the reasonable hours, produces the following presumptively reasonable fees, set forth in Table 2.A through Table 2.F below:

**TABLE 2.A – ATTORNEY DEFORD**

| Year | Hours Allowed | Hourly Rate | Fees Allowed |
|---|---|---|---|
| 2008 | 105.8.0* | $176.25 | $18,113.53* |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 33.7 | $183.75 | $6,192.38 |
| Subtotal | 139.5 | | $24,305.91 |

**TABLE 2.B – ATTORNEY MURPHY**

| Year | Hours Allowed | Hourly Rate | Fees Allowed |
|---|---|---|---|
| 2008 | 137.7** | $176.25 | $24,010.27** |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 1.1 | $183.75 | $202.13 |
| Subtotal | 138.8 | | $24,212.40 |

**TABLE 2.C – ATTORNEY SHEEHAN**

| Year | Hours Allowed | Hourly Rate | Fees Allowed |
|---|---|---|---|
| 2008 | 0.0 | $176.25 | $0.00 |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 0.0 | $183.75 | $0.00 |
| Subtotal | 0 | | $0.00 |

**TABLE 2.D – ATTORNEY STEIN**

| Year | Hours Allowed | Hourly Rate | Fees Allowed |
|---|---|---|---|
| 2008 | 0.0 | $176.25 | $0.00 |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 0.0 | $183.75 | $0.00 |
| Subtotal | 0 | | $0.00 |

**TABLE 2.E – ATTORNEY GIFFORD**

| Year | Hours Allowed | Hourly Rate | Fees Allowed |
|---|---|---|---|
| 2008 | 0.0 | $176.25 | $0.00 |
| 2009 | 0.0 | $176.25 | $0.00 |
| 2010 | 0.0 | $180.00 | $0.00 |
| 2011 | 3.3 | $183.75 | $606.38 |
| Subtotal | 3.3 | | $606.38 |

\* = 6.0 hours of travel at travel rate of $88.13.

\*\* = 3.0 hours of travel at travel rate of $88.13.

**TABLE 2.F – SUBTOTALS BY ATTORNEY**

| Attorney | Fees Allowed |
|---|---|
| Deford | $24,305.91 |
| Murphy | $24,212.40 |
| Sheehan | $0.00 |
| Stein | $0.00 |
| Gifford | $606.38 |
| TOTAL | $49,124.69 |

4.  APPROPRIATE ADJUSTMENTS

As previously indicated, the last step in ruling on a motion for attorney's fees is for the Court to "make any appropriate adjustments to arrive at the final fee award."  Adorno, 685 F. Supp. at 511.

Defendant argues for a twenty to sixty percent "across-the-board reduction[,]" possibly a fifty percent reduction, in light of the fact that plaintiff did not sue the proper defendant, and refused to add Aetna to this litigation, after being informed by defense counsel. (Dkt. #55, at 25, 31-33).  Defense counsel appropriately emphasizes that "[d]espite this and instead of relying solely on defendant's motion to dismiss, government counsel went above and beyond the call of duty by reaching out to Aetna directly to inform the insurer of the lawsuit and plaintiff's allegations." (Id. at 32).  Plaintiff's counsel concedes in her e-mail that because of defense counsel's contacts, Aetna agreed to continue home health care benefits to plaintiff.  (Id.). In her reply brief, plaintiff argues that the only judicial ruling in this case, i.e., the TRO "entirely favored plaintiff, [so] no reduction is warranted." (Dkt. #58, at 10).

Defense counsel is correct that the unusual procedural history of this case is the classic "no good deed goes unpunished."  Neither side took appropriate measures in 2009 regarding attorney's fees somewhere in the future – plaintiff apparently failed to advise defendant that she was preserving her potential to seek such fees, and defendant apparently never expressed her refusal to provide any.  As a result, an "across-the-board reduction" of 33.3% is warranted, resulting in a total attorney's fee award of **$32,717.04**.

5.  COSTS

The parties agree that plaintiff is entitled to $835.50 in costs.  (Dkt. #52, at 20; see Dkt. #58, at 10; see Dkt. #55, at 25-37 (no challenge to costs discussed)).

31

### III. CONCLUSION

Accordingly, the reasons stated above, plaintiff's Motion for Attorney's Fees and Costs (Dkt. #52) is **granted in part, in the amount of $32,717.04 for attorney's fees and $835.50 in costs, for a total of $33,552.54**.

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**; Caidor v. Onondaga County, 517 F.3d 601, 603-05 (2d Cir. 2008)**(failure to file timely objection to Magistrate Judge's discovery ruling will preclude further appeal to Second Circuit)**.

Dated this 26th day of October, 2011 at New Haven, Connecticut.


   Joan G. Margolis, USMJ     
Joan Glazer Margolis
United States Magistrate Judge